## IN THE UNITED STATES DISTRICT COURT OF THE
## DISTRICT OF COLUMBIA

IN THE MATTER OF THE SEARCH OF            )
Alcatel One Touch Cellular Telephone, Model 7040N  )
IMEI 014188001864161                      )

### AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Alicia M. McShane, Special Agent with the Federal Bureau of Investigation (FBI), Northern Virginia Resident Agency of the Washington Field Office (WFO), Washington D.C., (hereinafter the "affiant") being duly sworn, depose and state the following:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant for the authorization for the examination and extraction of electronically stored information contained in nine cellular telephones. The electronic devices to be searched are described further in the following paragraphs and Attachment A.

2. I am an "investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7) and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516. As a federal agent, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

3. I am a Special Agent of the FBI assigned to the Northern Virginia Resident Agency of the Washington Field Office. I have been a Special Agent with the FBI since August 2009. I am currently assigned to investigations relating to, among other things, crimes against children, including the sex trafficking of children and prostitution investigations. I have gained expertise in the conduct of such investigations through formal training and on-the-job training with more experienced agents. I have received training and experience in interviewing and

interrogation techniques, arrest procedures, search warrant applications, surveillance, and a variety of other investigative tools available to law enforcement officers. In addition, I have received specialized training in commercial sexual exploitation of children and have participated in numerous interviews and debriefings of persons involved in prostitution and child prostitution. I have conducted and participated in numerous sex trafficking investigations, which have resulted in the arrest and conviction of individuals. Based on my training, experience, and participation in this investigation I know that:

    a.    Individuals who organize, monitor and/or operate an illegitimate escort business or prostitution business, are commonly referred to as "pimps." It is the pimp's job to control, organize, monitor and provide security for his prostitutes. Pimps often maintain control of their prostitutes through physical violence and threats.

    b.    Prostitution remains largely a cash business and pimps are known to store or carry significant amount of cash. A pimp will commonly receive all of the cash proceeds of the prostitution business from his prostitutes. A pimp usually prohibits his prostitutes from possessing enough cash to survive without the pimp.

    c.    The pimp uses the prostitute's earning to provide her with food, housing, transportation, and clothing. The housing used by pimps may be temporary or permanent to include private homes, apartments, and/or hotel or motel rooms.

    d.    Pimps sometimes arrange for the transportation of the prostitutes to the customers' locations. This is referred to as an "Outcall," when a prostitution date is arranged and the escort travels to the location of the client. This includes arranging for drivers and/or driving the prostitutes themselves. Sometimes pimps use the internet, telephones, Global Positioning Systems, or other devices to aid in providing directions to customers' locations.

e. Pimps often use aliases and help prostitutes obtain or maintain false identities. As such, pimps often maintain items consistent with the provision of false identification including, but not limited to: false "official" documents, correspondence, bills and mail addressed to false names. Pimps may also give his prostitutes a nickname to help mask their true identity. This nickname is then used by the pimp, other prostitutes, and those paying for sexual services in exchange for money as the prostitute's name.

f. Pimps regularly photograph their prostitutes in various stages of undress and often use those photographs to advertise the prostitutes in print media or on-line. The photographs are taken with cameras and telephones with camera capabilities and stored on cameras, telephones, and other computers.

g. Pimps commonly use telephones to communicate, via wire and texting capabilities, with prostitutes and customers. Almost all communication between a pimp and prostitute, while she is working, is conducted by mobile telephone. To control use of the telephone, the pimp often purchases a telephone for his prostitutes to use. As a result, a pimp may have multiple telephones that he uses, including telephones to communicate with customers, telephones to communicate with the prostitutes, telephones that the prostitutes use, and telephones used for activities that are not illegal. The communications and the communication records are of evidentiary value in identifying other individuals involved in a prostitution scheme.

h. Pimps commonly use computers to send emails, to communicate with customers, and to arrange for the advertising of the prostituted in print media and on-line. Computers are commonly used to store information about the illegal operation such as: photographs, calendars, addresses, customer lists, advertisements and financial records.

3

      i.     Pimps commonly maintain telephone numbers, addresses and directions in telephones, computer databases, books and papers.

## BASIS FOR FACTS CONTAINED IN THE AFFIDAVIT

4.     Throughout this investigation, law enforcement officers and agents have worked together to collect and record information about the illegal activities of those under investigation. The facts and information contained in this affidavit are based upon my personal knowledge, information obtained from state and federal law enforcement officers, and information provided by a cooperating witness.

5.     This affidavit contains information necessary to support probable cause for this application. It is not intended to include each and every fact and matter observed by me, other law enforcement officers, or known to the government. Not every fact known to this investigation or by the government is set forth in this affidavit. Additionally, unless otherwise noted, wherever in this affidavit I assert that a statement was made by an individual, that statement is described in substance, and in part, and is not intended to be a verbatim recitation of the entire statement.

## IDENTIFICATION OF THE TARGET DEVICES TO BE EXAMINED

6.     This affidavit is respectfully submitted in support of a search warrant for:

     a)     A Alcatel One Touch cellular telephone, Model 7040N, with IMEI 014188001864161 (hereinafter referred to as **"Target Telephone"**). **Target Telephone** was seized from the apartment of DARAYA MARSHALL, aka DEE (hereinafter referred to as "MARSHALL") and JARNESE HARRIS, aka JAY, (hereinafter referred to as "HARRIS") subsequent to the execution of a search warrant at their residence located on South Capitol Street, SE, Washington, D.C.

7. The applied-for search warrant would authorize the forensic examination of the **Target Device** for the purpose of identifying electronically stored data particularly described in Attachment B.

## RELEVANT STATUTES

8. Pursuant to Title 18, United States Code, Section 2421, it is a violation of federal law for a person to "knowingly transport any individual in interstate commerce . . . with the intent that such individual engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense, or attempt to do so."

9. Pursuant to Title 18, United States Code, Section 1591, it is a violation of federal law for a person to "knowingly- in or affecting interstate commerce... recruit, entice, harbor, transport, provide, obtain, or maintain by any means a person; or benefit, financially or by receiving anything of value...knowing, or in reckless disregard of the fact, that means of force, threats of force, fraud, coercion...or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act."

## FACTS ESTABLISHING PROBABLE CAUSE

10. The **Target Device** is currently in the lawful possession of the FBI. It came into the FBI's possession in the following ways: (1) **Target Telephone** was seized from the apartment of MARSHALL and HARRIS on June 29, 2015, subsequent to the execution of a search warrant.

11. The **Target Device** is currently in storage in the Evidence Control Room at the FBI office in District of Columbia. In my training and experience, I know that the **Target Device** has been stored in a manner in which its contents are, to the extent material to this

investigation, in substantially the same state as they were when the **Target Device** first came into the possession of the FBI.

12. For the reasons set forth below, I respectfully submit there is probable cause to believe that evidence of the sex trafficking of children and benefitting financially from human trafficking will be located on the **Target Device**.

13. On Tuesday, May 26, 2015, at 1540 hours, the juvenile (A.C.) was interviewed at her place of abode. The complainant advised she had been prostituted by MARSHALL and HARRIS for approximately two weeks in the month of May 2015. The complainant advised that they exploited her in various locations in the Metropolitan Area of Washington, D.C. as well as Maryland. The child advised that the sexual exploitation was set up by MARSHALL or HARRIS.

14. The complainant also advised law enforcement that MARSHALL set the prices for she and the other girls that he exploited. The complainant relayed that she was advised by MARSHALL what to charge her dates for straight sexual intercourse and for oral sex. The complainant advised that sexual intercourse without a condom (also called "bare back") would be additional money. The complainant advised that some of the dates ask for anal sex but, she refused. The complainant advised that after every date she had to give MARSHALL half of the money she earned and on at least one occasion she had to give his girlfriend, HARRIS her earnings for that day. The complainant advised that she would average approximately $200 dollars per day for providing sexual services.

15. The complainant further related that MARSHALL and HARRIS would set up the dates by using the Internet and a website called Backpage.com, known to law enforcement officers as a website used to advertise sexual services. The complainant advised that

MARSHALL and HARRIS exploited her, along with other girls, who were also prostituted out of hotels in the Metropolitan area. The hotels were mostly in Maryland and Washington, D.C. The complainant advised that most of time she and the other girls did "in calls" at the apartment that HARRIS and MARSHALL shared on South Capitol Street S.E Washington, D.C. An "In Call" is where a commercial sex customer looking for sexual services goes to a location where a person selling commercial sexual services is located. The complainant further advised law enforcement that MARSHALL and HARRIS took several photos of her and posted the photos on Backpage.com, under the nickname of "Cherry" as part of the advertisements for sexual services. The complainant related to the affiant that she would have sexual intercourse with commercial sex customers in the living room of the apartment on South Capitol Street, specifically on a white leather sofa. The complainant advised that MARSHALL and HARRIS provided all the girls working for them multiple packs of condoms that were left in containers secreted around the apartment. The complainant advised that MARSHALL and HARRIS used cellular telephones to take photographs for the online prostitution advertisements. In a search warrant executed on the cellular telephone that was recovered from MARSHALL, multiple photos and videos of girls were present on his cellular telephone. The complainant witnessed some of the videos on MARSHALL's cellular telephone and disclosed that one video depicted a female known to her as a juvenile performing oral sex on MARSHALL.

16. The complainant disclosed that at any given time there would be at least six or seven girls staying as well as prostituting out of MARSHALL and HARRIS's apartment on South Capitol Street Southeast, Washington, D.C.

17. On Tuesday, May 26, 2015, an FBI Intelligence Analyst working with the MPD-FBI Child Exploitation Task Force was able to find several Backpage.com advertisements

7

containing the complainant's photograph and other females possibly working for MARSHALL and HARRIS. In addition, those advertisements had photographs of the complainant under the moniker "Cherry" wearing just her underwear with her breast slightly exposed. Further, one of the Backpage.com advertisement photographs displayed a scantily clad female lying on a white leather sofa.

18. On Friday, June 12, 2015, the complainant was presented with several Backpage.com advertisements that contained photographs of different females that she may have known from her exploitation by MARSHALL and HARRIS. The complainant was able to identify two additional juveniles in the Backpage.com advertisements, as well as HARRIS pictured in the prostitution advertisements.

19. On Wednesday, June 17, 2015, the complainant was shown two confirmation photos of HARRIS and MARSHALL. The complainant stated "That's Jarnese, but I sometimes call her Jay" and "That's Dee, I can't pronounce his name it is spelled D-A-R-A or something like that!"

20. On June 29, 2015, a search warrant was executed at the South Capitol Street Apartment in Washington, D.C. A number of pertinent items were photographed and/or seized as evidence, including items related to the online advertisements referenced in paragraphs 17 and 18 of this affidavit on the Backpage.com website. More specifically, the following items that appeared to be in the photographs in the online advertisements were photographed during the execution of the search warrant: a white leather couch, cream colored chairs that appear to be the same chairs pictured in the advertisements, a red and tan colored plaid blanket beneath a female in an online advertisement, a blue floral printed blanket depicted in the online advertisements, and a distinct pair of high heeled leopard print lace up boots worn by females depicted in the

aforementioned advertisements. In addition, a piece of notebook paper was located that appeared to be a handwritten draft of a prostitution advertisement for "Cherry". An advertisement posted to the Backpage.com website on May 14, 2015 for "Cherry" has text that is almost identical to the handwritten draft located subsequent to the search warrant in the apartment of MARSHALL and HARRIS.

21. Additional items associated with sex trafficking were also seized subsequent to the execution of the search warrant at the South Capitol Street Apartment in Washington, D.C., including the following: fifty-seven debit or prepaid credit cards, condoms, lubricant, multiple wigs, multiple pairs of high heeled shoes in various sizes, and lingerie in various sizes.

22. On July, 20, 2015, a search warrant was executed on the 1999 black Lexus GS3 four door sedan with District of Columbia registration EX0341, belonging to HARRIS. Items associated with sex trafficking located and photographed and/or seized included the following: nine debit or prepaid credit cards, condoms, lubricant, multiple pairs of high heeled shoes in various sizes, and a motel key card.

23. Multiple administrative subpoenas were served on Backpage.com related to the advertisements that contained what law enforcement officers believed to be A.C. and others exploited by MARSHALL and HARRIS. Administrative subpoena responses included a portion of the debit or credit card number used to pay for each advertisement. Specifically, the first six and last four numbers of each card were included while the middle six digits were not. The portion of the payment information for the advertisements provided by Backpage were cross referenced with the prepaid debit and credit cards located during the execution of the search warrants of the Lexus GS3 with District of Columbia registration EX0341 and the apartment located on South Capitol Street, SE, Washington, D.C. Sixteen prepaid debit and credit card

numbers from cards recovered during the apartment search matched the portion of payment information provided from Backpage for the payment of the online prostitution advertisements related to this investigation. Of the prepaid debit and credit cards located during the Lexus search warrant, six of the numbers matched the portion of payment information provided from Backpage for the payment of the online prostitution advertisements online prostitution advertisements related to this investigation.

24. Search warrants were executed for the cellular telephones recovered from MARSHALL and HARRIS. The telephone numbers associated with MARSHALL and HARRIS' cellular telephones do not encompass all of the telephone numbers that were identified as related to this sex trafficking enterprise. There are additional telephone numbers from the Backpage.com advertisements that contain photographs of identified victims and/or photographs that are believed to have been taken in the residence of MARSHALL and HARRIS.

25. Based on my training and experience, examining data stored on the **Target Device** can uncover, among other things, evidence that reveals or suggests who possessed or used the devices, as well as evidence of the crimes alleged in this affidavit.

### TECHNICAL TERMS

26. Based on my training and experience, I use the following technical terms to convey the following meanings:

    a) Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of

calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b) The Internet is a global network which allows for the sharing of data across computers attached to the network. Individual users typically access the Internet through a local Internet Service Provider ("ISP") through a modem or other connection device, such as a cable or Digital Subscriber Line ("DSL"). When accessing the Internet, the ISP will assign each user an Internet Protocol ("IP") address, a unique number used by a computer to access the Internet. IP addresses can be dynamic, meaning that the ISP assigns a different unique number to a computer every time it accesses the Internet. IP addresses can also be static, whereby the user's ISP assigns the computer a unique IP address, and that same number is used by the user every time the computer accesses the Internet.

c) Communication via the Internet can take place through many different mediums like accessing a website or sending and receiving electronic mail, also known and referred to herein as "e-mail." E-mail is an electronic form of communication which can contain letter-type correspondence and graphic images. E-mail is similar to conventional paper type mail in that it is addressed from one individual to another. E-mail messages usually contain a header that gives the screen name, the identity of the Internet access provider, and the return address on

the Internet of the individual who originated the message or graphic. The Internet also allows individuals to trade pictures or images, often through e-mail or by downloading images from a website or another individual's computer, as described below. Photographs and other images can be stored as data on a computer. This storage can be accomplished using a "scanner," which is an optical device that can recognize images or characters on paper and convert them to digital form by using specialized software. After the photograph or other image has been scanned into the computer, the computer stores the data from the image as an individual "file." Such a file is generally known as a "GIF" (Graphic Interchange Format) or "JPEG" (for the Joint Photographic Experts Group, which wrote the standard) file, recognizable by the ".gif" or ".jpg" file extensions (hereinafter referred to as an "image file").

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

27. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

28. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

    a) Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

  b) Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

  c) A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

  d) The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

  e) Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

29. *Nature of examination.* Based on the foregoing, the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

30. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve

13

the physical intrusion on to a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

31. I believe that a search of these items will show communication between MARSHALL and uncharged/unindicted co-conspirators and may identify other co-conspirators and victims.

32. Based upon these facts, there is probable cause to believe that there are fruits and evidence of offenses involving violations of Title 18, United States Code, Sections 2421 and 1591 that will be found within the seized items, as further described in Attachment A.

37. I declare under penalty of perjury that the statements above are true and correct to the best of my knowledge and belief.

                                                    Alicia McShane
                                                    Special Agent
                                                    Federal Bureau of Investigation

Sworn and subscribed before me
this \_\_th day of September 2015.

The Honorable G. Michael Harvey
United States Magistrate Judge